UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
MITCHELL TAEBEL,                                        :
                                                        :
                        Petitioner,                     :           1:16-cv-06337-WHP-JLC
                                                        :
                        - against -                     :
                                                        :
JUSTICE MICHAEL SONBERG,                                :
                                                        :
                        Respondent.                     :
-------------------------------------------------------------- x


## MEMORANDUM OF LAW IN OPPOSITION TO
## THE PETITION FOR A WRIT OF HABEAS CORPUS

                                ERIC T. SCHNEIDERMAN
                                Attorney General of the
                                State of New York
                                <u>Attorney for Respondent</u>
                                120 Broadway
                                New York, New York 10271
                                Paul.Lyons@ag.ny.gov
                                (212) 416-8229


PRISCILLA I. STEWARD
PAUL B. LYONS
Assistant Attorneys General
<u>Of Counsel</u>

February 14, 2017

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

FACTUAL AND LEGAL BACKGROUND .................................................... 2

  A.    The Trial ............................................................................................ 2

      1.    The People's Case ..................................................................... 3

      2.    Petitioner's Case ...................................................................... 9

      3.    The Verdict............................................................................. 12

      4.    Motion to Set Aside the Verdict .................................... 12

      5.    Sentencing............................................................................. 13

  B.    CPL § 440.10 Motion to Vacate Judgment .................................... 13

  C.    The Direct Appeal............................................................................ 14

ARGUMENT ...................................................................................................... 15

  THE APPELLATE DIVISION CORRECTLY DENIED PETITIONER'S LEGAL
  SUFFICIENCY CLAIM............................................................................ 15

CONCLUSION..................................................................................................... 31

## <u>INTRODUCTION</u>

On September 2, 2011, Frank Martoni was working as a doorman in the lobby of The Barclay, a high-rise luxury residential building located at 1755 York Avenue in Manhattan.  At around 12:15 p.m., petitioner entered the lobby and began walking past the front desk where Martoni and the building manager, Andrea Weinbaum, were talking.  Neither Martoni nor Weinbaum recognized petitioner as a resident or tenant of the building, and petitioner did not have a valid permission-to-enter slip on file with the front desk.

Martoni told petitioner that he would need to be announced.  In a raised voice, petitioner replied, "I live here. What is your fucking problem, Frank?"  Weinbaum then asked petitioner is he was a tenant.  Again, petitioner swore and told them that he lived there.  Martoni positioned himself between petitioner and the nearby elevators.  One of the elevators opened and petitioner started walking towards it. Martoni backed up with his arms out, and then turned to position himself in front of the elevator door.  Petitioner then said, "What is your fucking problem, Frank?" as he punched Martoni twice in the left eye.  Staggering, Martoni held onto the elevator entrance for support.  Petitioner then hit Martoni two more times in the left eye, and Martoni walked or was knocked out of the elevator.  The elevator doors shut and petitioner went upstairs to his girlfriend's apartment.  The police soon arrived and arrested petitioner in the apartment.  Martoni sustained fractures to the orbital socket of his left eye that were surgically repaired with titanium plates and screws.

Following a jury trial in New York State Supreme Court, New York County,

petitioner was convicted of assault in the third degree and attempted assault in the second degree, and acquitted of second-degree criminal trespassing. He was sentenced to two concurrent, definite jail terms of six months along with five years of probation. The Appellate Division, First Department, unanimously affirmed the judgment of conviction. *People v. Taebel*, 138 A.D.3d 606 (1st Dep't), *lv. denied*, 27 N.Y.3d 1156 (2016).

Petitioner now argues in his pro se federal habeas corpus petition that the evidence at trial was legally insufficient because Martoni's testimony was inherently inconsistent and was also contradicted by the testimony of petitioner and Weinbaum. This claim is patently meritless, both because habeas courts are prohibited from reviewing issues going to credibility, and because the testimonial inconsistencies that petitioner highlights are either non-existent or trivial. The petition should, therefore, be denied, and no certificate of appealability should be issued.

## FACTUAL AND LEGAL BACKGROUND

### A.    The Trial

A New York County grand jury charged petitioner with Attempted Assault in the Second Degree (Penal Law §§ 110/120.05(1)), Criminal Trespass in the Second Degree (Penal Law § 140.15(1)), and Assault in the Third Degree (Penal Law § 120.00(1)). (SR13-15.)[1] Petitioner's trial commenced on January 9, 2013, before New

---

[1] Citations to "SR" refer to the State Court Record, submitted via ECF. Citations to trial testimony refer to the witness name and the page number. Other citations to the trial simply employ the prefix "T."

York County Supreme Court Justice Michael Sonberg and a jury. Petitioner proceeded pro se, but was assisted by appointed standby counsel.

### 1. The People's Case

In September 2011, Frank Martoni and Andrea Weinbaum both worked at The Barclay, a 325-unit, luxury high-rise building located at 1755 York Avenue between 91st and 92nd Streets. (Martoni: 27-29, 38; Weinbaum: 129.) Ms. Weinbaum was the on-site building manager for Glenwood Management, which owned building. (Weinbaum: 129-30.)

Martoni was 48 years old and had been working as a doorman at the building for nearly 28 years. (Martoni: 28-29.) His responsibilities included announcing visitors, and his "number one responsibility" was "the security of all the tenants." (Martoni: 29.) However, he had no self-defense training and did not carry a weapon. (Martoni: 30-31.)

The Barclay doormen were expected to announce all visitors and to allow them in only if the tenant consented. (Martoni: 29-32, 82; Weinbaum: 131.) The doormen had a list of people who were registered as "roommates" on a tenant's lease and who were thus permitted entry without being announced. (Weinbaum: 130-31.) The building also employed a system of permanent and temporary "permission to enter" slips. (Martoni: 31, 35; Weinbaum: 131-32.) Permanent permission-to-enter slips had to be approved by the management office and were mainly for nannies, caregivers, and housekeepers. (Martoni: 31; Weinbaum: 131.) Temporary slips lasted for four days and were signed by the tenants and kept at the front desk. (Martoni:

31, 33-35.)  After the temporary slips expired, they would be "removed and discarded."  (Martoni: 35.)  If a person appeared at the front door and claimed to be staying in a tenant's apartment, but was not on the "roommate" list and did not have a permission-to-enter slip, the doorman was to call the management office.  (Martoni: 32-33; Weinbaum: 132.)  The doorman was "not allowed to physically touch anybody" to prevent that person from entering the building.  (Martoni: 84-85.)

On September 2, 2011, at around 12:15 p.m., Martoni and Weinbaum were talking together at the front desk of the building's lobby.  (Martoni: 38, 46, 49; Weinbaum: 133.)[2]  No one else was in the lobby.  (Martoni: 40.)  Petitioner walked into the lobby, passed the front desk, and was heading towards the elevators. (Martoni: 38, 49; Weinbaum: 133.)

Martoni had seen petitioner before, but had not seen him in the building frequently enough to think that he was "living there."  Martoni could not recall what date he first saw petitioner, though he thought it was probably in 2011.  (Martoni: 36-37, 69, 73-74, 87-88.)[3]  Prior to August 2011, Martoni had seen petitioner when he would leave in the mornings with Raquel Toro, a resident of the building.  (Martoni: 36-37, 69; Weinbaum: 133.)  On a previous occasion, in August 2011, petitioner had entered the lobby, and Martoni had told him that he needed to be announced.

---

[2] The court received into evidence photographs of the building lobby and the elevator bank, as well as surveillance video of the lobby.  (Martoni: 43-51.)  The camera, however, was pointed at the front door of the building, and thus did not record the altercation in and around the elevator bank.  (Martoni: 48-49.)

[3] Martoni testified in the grand jury that he first met petitioner in August of 2011.  (Martoni: 75.)

Petitioner had responded that there was a permission slip for him at the front desk, which Martoni had then confirmed, allowing petitioner to proceed upstairs. (Martoni: 36-37, 66-68.) For her part, Weinbaum did not know petitioner and was not aware of his relationship with Toro. (Weinbaum: 134, 139-40.)

On the occasion at issue here, when petitioner entered the lobby, Martoni told him that he needed to be announced. (Martoni: 38, 49; Weinbaum: 133-34.) Although petitioner previously had a permission-to-enter slip on file, the slip had expired and Martoni had removed it. (Martoni: 39-40, 87.) Moreover, Martoni had never been notified that petitioner had "moved in" or that he was Ms. Toro's "roommate." (Martoni: 83-84.)

Petitioner "seemed very agitated" and "angry" about Martoni's request. Petitioner "came back towards" Martoni, "raised his voice," and asked Martoni: "what is your fucking problem, Frank." (Martoni: 38, 49; Weinbaum: 134.) Weinbaum then introduced herself and told petitioner that he could not enter without a permission-to-enter form. (Weinbaum: 134.) Petitioner became "angry" and "hostile," and stated: "I fucking live here." (Martoni: 38, 49; Weinbaum: 134-35.)

Weinbaum continued to try to talk to petitioner. Martoni grabbed his radio to call the management company and positioned himself between petitioner and the elevators. (Martoni: 38-39, 49-50.) Petitioner walked away from Weinbaum and towards the elevators (out of range of the lobby camera). Martoni, who was then facing petitioner, had "his arms out" to his sides and was backing up to block petitioner from entering one of the elevators that had just opened. (Martoni: 39-40,

5

42, 50; Weinbaum: 135-36.)  Petitioner was "very close" to Martoni – "pretty much in his face."  (Weinbaum: 137-38.)  Nobody else was in the vicinity.  (Martoni: 40.)

Weinbaum testified that Martoni put his arms out "against the elevator so that [petitioner] would not go in the elevator."  (Weinbaum: 136.)  However, Weinbaum then turned around to greet people whom she thought "looked like they were coming in" to the lobby.  (Weinbaum: 136.)  That is, she "turned around . . . towards the front door of the building" and "no longer saw both Mr. Martoni and the defendant."  (Weinbaum: 136-37.)[4]  Weinbaum could see the elevator door from where she was standing but could not see inside the elevator.  (Weinbaum: 138.)

In case petitioner entered the elevator, Martoni planned to put his foot in the elevator door to make sure it did not close with petitioner inside.  (Martoni: 40.)  As Martoni turned towards the open elevator, petitioner said, "What is your fucking problem, Frank?"  At that point Martoni "received two shots [punches] to [his] left temple," just next to his left eye.  (Martoni: 39.)  Martoni was "stunned, basically," as he "didn't know what had happened to" him.  (Martoni: 40.)  He "staggered and . . . grabbed hold" of the entrance to the elevator because he "could feel [him]self falling," and he "didn't want to fall down . . . into the elevator."  (Martoni: 39-40.)  He did not fall "all the way" into the elevator" but was only "knocked partially into the elevator."  (Martoni: 63-64.)  He "pulled [him]self out" and again heard petitioner say "what is

---

[4] Weinbaum's testimony is unclear, and could be construed to mean either that she turned around to look at the front door of the lobby and thus did not see the altercation, or that she turned around to look at the elevator bank and did not see petitioner and Martoni there.  (Weinbaum: 136-37.)

your fucking problem" in his left ear, though he did not see where petitioner was. (Martoni: 39-41, 47, 63.) At that point, Martoni "received two more shots [punches] to the same spot" on the side of his head. (Martoni: 39-40.) Martoni ended up "on the other side of the hall" outside the elevator. (Martoni: 39.) He turned to his left and saw petitioner in the elevator as the doors closed. (Martoni: 39, 42.)

Martoni testified that he did not "strike" or "touch" petitioner during the altercation. (Martoni: 41.) Nor did he "swing a punch" at petitioner or try to hit him with the radio. (Martoni: 42.)

Martoni testified that he distinctly heard four separate "cracks" to his head. (Martoni: 62.) When he received the first two blows, his hands were at his side, and when he received the second two blows, his hands "were probably hanging down because [he] was leaning against the wall . . .." (Martoni: 42.)

Martoni testified that the first two blows opened up a cut above his left eyebrow, which was "throbbing." Blood was "dripping down" his face. (Martoni: 41.) After the second two blows, Martoni felt "fuzzy" and "numb," and walking was "an effort." (Martoni: 41.)

Weinbaum testified that she did not see the physical altercation between petitioner and Martoni. However, she did see Martoni "come out of the elevator holding his left eye," at which point she "ran to get help" from the superintendent. (Weinbaum: 137-38.)

Martoni immediately radioed the superintendent that he had been "assaulted" and needed help. He then went to the front desk, grabbed the second radio, and called

the police to report the assault and ask for assistance. (Martoni: 42, 50.) He held his head and stayed at the front desk until he was relieved. He then went to the management office, where he cleaned up the blood and tended to his wounds until emergency personnel arrived. (Martoni: 42-43, 50-51.) Weinbaum testified that the "white part" of Martoni's eye was "all red," and the area around the eye was bruised and bloody. (Weinbaum: 139.)

Around 12:30 p.m., Police Officer Michael Farinaccio received a radio transmission about an incident at The Barclay. (Farinaccio: 92-93.) Upon his arrival, Farinaccio spoke with Martoni and noticed that he was bleeding from a laceration above his left eye. (Martoni: 43; Farinaccio: 93-94.) Farinaccio then went to Ms. Toro's apartment and knocked on the door for about five minutes until petitioner finally came to the door. (Farinaccio: 94-95.) Farinaccio arrested petitioner, who had no visible injuries and did not receive medical attention. (Farinaccio: 94-95.)

When medical personnel arrived at The Barclay, they inspected the cut by Martoni's eye. (Martoni: 43, 51.) The left side of Martoni's face was still "throbbing," and Martoni was taken to the hospital. There, he felt dizzy and nauseated, and vomited twice in the emergency room. He was given pain killers. (Martoni: 51-52.) He was treated by an "ENT" and an ophthalmologist. Based on a CAT scan, Martoni was told that he would need surgery to repair the "orbital fractures to the side and on the floor of the eye socket." (Martoni: 51-52.) Martoni identified photographs taken at the emergency room depicting his wound. (Martoni: 56; SR209-12.) His doctors ordered him not to return to work or exert himself, and to eat only soft foods

for the next five weeks.  (Martoni: 53.)  Copies of Martoni's medical records were received into evidence.  (Martoni: 61-62; SR214-34, 236-82.)[5]

Later in September, Martoni had surgery in which permanent titanium plates and screws were inserted to correct the fractures in his eye socket.  (Martoni: 52, 54-55.)  For the next six months, the left side of his face felt numb.  (Martoni: 55.)

### 2.    Petitioner's Case

Petitioner testified that at the time of the trial, he was 25 years old, 5'10" tall, and weighed 176 pounds.  (Taebel: 176.)[6]  He worked out regularly, including "cardio" and strength training.  (Taebel: 176.)

Petitioner's girlfriend, Raquel Toro, lived in an apartment at 1755 York Avenue, and he moved in with her on May 10, 2011.  (Taebel: 146-47.)  After moving in, petitioner lived "mainly in New York," but was in Indiana for more than a week in June and was in Mexico for most of August.  (Taebel: 149, 180.)  He was unemployed and worked occasionally "all over," including Florida, California, and Indiana.  (Taebel: 177.)  He never had a New York State driver's license and never had mail sent to 1755 York Avenue except under Toro's name.  (Taebel: 200-01.)  He offered into evidence, among other things, certain credit card statements and documents from a nearby health club that purportedly established that he lived at 1755 York Avenue from May through August 2011.  (Taebel: 147-63, 178-80.)

---

[5] Martoni's medical records showed that he was 6'3" tall and weighed 301 pounds.  (SR239.)

[6] Because petitioner was proceeding pro se, he testified in narrative form on his own behalf.  (T.145.)

After petitioner moved in, Toro filled out several of the temporary permission-to-enter slips. (Taebel: 164.) The temporary slips each expired, but it was "never an issue," "so the majority of the time [he] lived there…there were not temporary slips filled out." (Taebel: 164.) In May, the doorman, Frank Martoni, stopped petitioner in the lobby and told him he did not have permission to enter. (Taebel: 164-65.) Petitioner told Martoni to call the office and check. Martoni did so and confirmed that there was a permission slip filled out. (Taebel: 165.) Martoni was not polite "at all," and petitioner "was pretty offended by that" and "sent [Toro] a text message right away." (Taebel: 165.) Martoni and petitioner never spoke after that – which petitioner found "pretty offensive." (Taebel: 166.)

On September 2, 2011, petitioner left the building to get breakfast. When he returned, Weinbaum and Martoni were standing at the front desk. (Taebel: 167.) As petitioner walked past, Martoni told him that he did not have permission to enter. Petitioner said, "Are you kidding me? I live here. What is this, a joke?" (Taebel: 168.) Petitioner believed that "they did not have good intentions," and "were being jerks." (Taebel: 169.) Weinbaum then introduced herself, and petitioner shook her hand. (Taebel: 169.) Weinbaum told petitioner that he did not have permission to go upstairs, and petitioner responded that she could call the police if she wanted to. (Taebel: 169.) Petitioner said, "You can't try and stop me, you can't physically try and stop me." Angry and "very displeased" that Martoni and Weinbaum had questioned him, petitioner walked away towards the elevators. (Taebel: 169, 197.)

Martoni "chased" petitioner. (Taebel: 180-81.) The elevator doors opened, and

Martoni "jump[ed] in front of" petitioner and tried to "block" his access to the elevator by putting his arms out to the side, but petitioner "pushed right through into the elevator." (Taebel: 169, 181-83.) At that point, Martoni "lost it, like, he was, like, you know, he just lost it and he started attacking [petitioner] and it turned into, like, a frantic grabbing match." (Taebel: 169.) Petitioner "got hit in the face" once or twice, sustaining a bloody lip. (Taebel: 169-70, 188, 190.) Petitioner "pushed" Martoni away and then went back to the other side of the elevator "and stayed there for a second." (Taebel: 187-88.)

As petitioner was about to push the button for his floor, Martoni "lunged" at him, "just wouldn't stop," and "came back at him harder than the first time." (Taebel: 170, 187.) Petitioner knew from his self-defense classes that you "have to do what you have to do to maintain control of an altercation." (Taebel: 170.) Petitioner tried to get Martoni off of him, but Martoni was big and heavy and petitioner did not have room to "back up," "retreat," or "move around." (Taebel: 170.) Accordingly, "in self-defense," petitioner struck Martoni "one time" in the left eye "pretty close to as hard as [he] could." (Taebel: 170, 181, 190-91.) If he had had more room, petitioner would have hit him harder. (Taebel: 191.)

After petitioner hit Martoni, Martoni stopped and stared at petitioner. (Taebel: 170, 191.) Petitioner walked out of the elevator, and Martoni "calmly" followed. Petitioner then got back in the elevator and went up to the apartment. (Taebel: 170- 71, 192.)

Following the altercation, petitioner did not call 911 or the front desk and did

not go downstairs.  (Taebel: 194.)   A short time later, the police banged on the apartment door, and petitioner tried to "negotiate with them."  (Taebel: 192-93.)  Petitioner had a bloody lip – there was "a little bit of blood on [his] lower teeth" – but it had stopped bleeding by the time the police arrived.  (Taebel: 170, 194.)  Petitioner did not seek medical attention.  The police took him to the precinct and released him with a desk appearance ticket within an hour.  (Taebel: 195.)

### 3.    The Verdict

On January 16, 2013, the jury convicted petitioner of third-degree assault and attempted second-degree assault and acquitted him of second-degree criminal trespassing.  (T.282-83.)

### 4.    Motion to Set Aside the Verdict

At the close of the People's case, at the close of all evidence, and following the verdict, the court reserved decision on petitioner's motion to dismiss the attempted second-degree assault count, specifically on the question of whether petitioner had intended to cause serious physical injury.  (T.141-42, 206-07, 286.)

Petitioner subsequently filed a counseled motion under CPL § 330.30 to set aside the verdict.  He argued, among other things, that the People had failed to establish intent to cause serious physical injury.  (SR91-140.)  The People opposed the motion.  (SR141-283.)

According to petitioner's and the People's direct appeal briefs, the court held a hearing on May 1, 2013, at which it denied petitioner's motion to dismiss and the CPL §330.30 motion.  The court found that petitioner's actions – in punching Martoni two

more times even though Martoni was already staggering from the two previous punches – provided sufficient evidence that petitioner intended to cause serious physical injury.  (SR536-37, 581-82 (citing 5/1/13 Minutes at 3-5).)[7]

## 5.    Sentencing

At a hearing on May 10, 2013, the court sentenced petitioner to a definite jail term of six months along with five years of probation on the attempted second-degree assault count, and a concurrent sentence of six months on the third-degree assault count.  (5/10/13 Minutes at 18-19, 21-22.)

## B.    CPL § 440.10 Motion to Vacate Judgment

In August 2013, while petitioner's direct appeal was pending, he filed in the trial court a pro se CPL § 440.10 motion to vacate the judgment of conviction. Petitioner asserted a variety of claims, including that the verdict was based on legally insufficient evidence.  (SR284-90; *see* SR291-348 (Supplemental Affidavit); SR349-50 (supporting letter).)  The trial court denied the motion, holding that all of petitioner's claims were record-based and thus could be raised in his pending direct appeal. (SR358-62.)

Petitioner applied pro se to the Appellate Division, First Department, for leave to appeal.  (SR363-509.)  That was followed by a counseled leave application.  (SR510-13.)  On May 7, 2014, the Appellate Division denied leave (SR521).

---

[7] Respondent has been unable to obtain a copy of these minutes.

## C. The Direct Appeal

Petitioner filed a counseled brief on direct appeal in the Appellate Division, First Department, claiming that: (1) the verdict was against the weight of the evidence; and (2) the evidence was legally insufficient because it failed to establish that: (a) petitioner intended to cause serious physical injury, as required for attempted second-degree assault; and (b) petitioner's physical assault of Martoni was justified. (SR522-47; *see also* SR1-90 (Record on Appeal).) Petitioner also filed a pro se supplemental brief asserting that: (1) the verdict was against the weight of the evidence and was based on legally insufficient evidence because, among other reasons, Martoni's testimony was "incredible as a matter of law," as it was uncorroborated, internally inconsistent, and inconsistent with both Weinbaum's and petitioner's testimony; (2) the court was biased against petitioner; (3) the court improperly excluded proof establishing the date on which petitioner began residing in Ms. Toro's apartment; (4) the prosecutor engaged in misconduct; and (5) trial counsel was ineffective. (SR548-64.) The People filed an opposition brief (SR565-601), and petitioner submitted a pro se reply (SR602-06)

On April 26, 2016, the Appellate Division unanimously affirmed the judgment of conviction. *People v. Taebel*, 138 A.D.3d 606 (1st Dep't 2016) (SR607-09). The court held that the "verdict was based on legally sufficient evidence and was not against the weight of the evidence." *Id.* at 606. The court observed that there was "no basis for disturbing the jury's determinations concerning credibility." *Id.* The court further found that the "evidence refuted defendant's justification defense, and established his

14

intent to cause serious physical injury." *Id.* The court also stated that it had "considered and rejected defendant's pro se arguments." *Id.*

Petitioner filed a counseled application in the Court of Appeals requesting leave to appeal. Petitioner asserted all claims that were raised in the counseled and pro se briefs filed in the Appellate Division. (SR610-11.) On July 27, 2016, the Court of Appeals denied leave. *People v. Taebel*, 27 N.Y.3d 1156 (2016) (SR614).

## ARGUMENT

### THE APPELLATE DIVISION CORRECTLY DENIED PETITIONER'S LEGAL SUFFICIENCY CLAIM.

The petition asserts a single claim -- that the verdict was not supported by legally sufficient evidence. (Pet. ¶ 12.) The Appellate Division denied the claim, *Taebel*, 138 A.D.3d at 606, and that decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

The petition does not expressly assert that the People failed to establish any specific elements of either assault conviction. Rather, the petition asserts, as in petitioner's pro se brief on direct appeal, that Martino's testimony should be rejected as "incredible as a matter of law" because it was internally inconsistent and also contradicted by petitioner's and Weinbaum's testimony. The petition might be very liberally construed to assert that the People failed to establish that: (1) petitioner intended to cause serious physical injury, as required for attempted second-degree assault; and (2) petitioner's violent conduct was not justified. Accordingly, respondent will separately argue the following below: (A) the evidence established

the elements of each crime, including petitioner's intent to cause Martino serious physical injury; (B) the evidence established that petitioner's violent conduct was not justified; and (C) there is no legal or factual basis to petitioner's claim that Martino's testimony was incredible as a matter of law.

## A. The People Established the Elements of Petitioner's Assault Convictions

The People established beyond a reasonable doubt all of the elements of both of petitioner's assault convictions (excluding justification, which is addressed in the section that follows).  The Appellate Division's decision denying petitioner's legal sufficiency claim – and, finding among other things, that the People "established [petitioner's] intent to cause serious physical injury," *Taebel*, 138 A.D.3d at 606 – did not unreasonably apply clearly established Supreme Court law.

The relevant Supreme Court law was announced in *Jackson v. Virginia*, 443 U.S. 309 (1979), where the Court held that evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

The Supreme Court has further "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, __, 132 S. Ct. 2060, 2062 (2012) (*per curiam*); *accord Parker v. Matthews*, 567 U.S. 37, __, 132 S. Ct. 2148, 2152 (2012); *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010).  "First, on direct appeal, 'it is the

responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Johnson*, 132 S. Ct. at 2062 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*)). "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (citations omitted).

"Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense.'" *Johnson*, 132 S. Ct. at 2064 (citation omitted); *accord Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

A person is guilty of assault in the third degree when "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person." Penal Law § 120.00(1). "Physical injury" means "impairment of physical condition or substantial pain." Penal Law § 10.00(9). (*See* T.260.) "The statutory threshold of 'substantial pain' may be satisfied by relatively minor injuries causing moderate, but 'more than slight or trivial pain.'" *People v. Martinez*, 90 A.D.3d 409, 410 (1st Dep't 2011) (quoting *People v. Chiddick*, 8 N.Y.3d 445, 447 (2007)).

Those third-degree assault elements were clearly satisfied here. Petitioner admitted that he struck Martino. (Taebel: 170, 181, 190-91.) And the People's modest burden of proving "physical injury" was satisfied by: Martino's testimony regarding the injury and his surgery (Martoni: 50-62); his medical records (SR214-34, 236-82);

and Weinbaum's and Officer Farinaccio's testimony about the injury (Weinbaum: 139; Farinaccio: 93-94). *See, e.g., Robinson v. Mazzuca*, 01CIV.0001, 2002 WL 31246535, at *4 n.6 (S.D.N.Y. Oct. 7, 2002) (victim's testimony and medical records found to be sufficient proof of physical injury).

The People also established attempted second-degree assault. A person is guilty of second-degree assault, as relevant here, when, "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person." Penal Law § 120.05(1). "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." Penal Law § 110.00. "Attempted assault in the second degree can be proven without any serious physical injury or even any physical injury; all that is required is that the defendant intended such injury and engaged in conduct directed at accomplishing that objective." *People v. McCloud*, 121 A.D.3d 1286, 1287 (3d Dep't 2014) (citations and internal quotation marks omitted).

Petitioner's counseled and pro se briefs on direct appeal contended that the People did not establish that petitioner intended to cause Martoni serious physical injury. (*See* SR540-41, 558-59.) Yet the record clearly supported the verdict.

"'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." Penal Law § 10.00(10). (*See* T.252.) "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when

18

his conscious objective is to cause such result or to engage in such conduct." Penal Law § 15.05(1). (*See* T.252, 254.) "The element of intent is rarely proved 'by an explicit expression of culpability by the perpetrator.'" *People v. Barboni*, 21 N.Y.3d 393, 405 (2013) (citation omitted). Rather, "[a] jury is entitled to infer that a defendant intended the natural and probable consequences of his acts." *People v. Bueno*, 18 N.Y.3d 160, 169-70 (2011); *accord People v. Steinberg*, 79 N.Y.2d 673, 685 (1992); *People v. Lamont*, 25 N.Y.3d 315, 319 (2015) (jury may "infer the requisite intent from the defendant's conduct and the surrounding circumstances"). (*See* T.253 (jury charge).)

Here, drawing every inference in the People's favor, a jury could have reasonably determined that petitioner intended to cause Martoni serious physical injury. First, Martoni testified unequivocally that petitioner forcefully punched him four times in the temple just next to his left eye. (Martoni: 38-42, 62.) Moreover, petitioner had self-defense training (Taebel: 170), and he admitted that he hit Martoni "pretty close to as hard as [he] could" (Taebel: 190-91). New York courts have repeatedly held that the intent to cause serious physical injury can be established by evidence that the defendant punched the victim in the face more than once. *See People v. Ford*, 114 A.D.3d 1273, 1274 (4th Dep't 2014) (evidence established intent to cause serious physical injury where defendant "attacked the victim from behind and punched him in the face at least twice with a closed fist"); *People v. Caban*, 306 A.D.2d 141, 141 (1st Dep't 2003) ("Defendant's intent to cause serious physical injury could be readily inferred from the fact that he struck the

victim in the face with such force that he broke the victim's nose and briefly rendered him unconscious."); *Matter of Patrick W.*, 166 A.D.2d 652, 653 (2d Dep't 1990) ("evidence was of sufficient quantity and quality to establish that the appellant intended to cause serious physical injury to the complainant, by his infliction of a closed-fisted punch to her face during their classroom argument").

Second, the jury could have reasonably inferred petitioner's intent from the fact that he continued to punch Martoni – in the same spot – even after the first two punches had "staggered" Martoni and nearly knocked him to the ground. (Martoni: 39-41.) "A jury is entitled to infer that a defendant intended the natural and probable consequences of his acts." *Bueno*, 18 N.Y.3d at 169-70. It would have been reasonable for the jury to conclude that petitioner's repeated punches in the same part of Martoni's head – after Martoni had already been subdued – were simply intended to punish him and cause as much damage as possible.

Third, petitioner's intent may be inferred from the severity of Martoni's injuries.[8] That is, Martoni sustained fractures to his eye socket, and he testified that after just the first two blows he felt "fuzzy" and "numb," and he was so "staggered" that he "could feel [him]self falling." (Martoni: 39-41.) The jury could have

---

[8] *See People v. Snyder*, 100 A.D.3d 1367, 1368 (4th Dep't 2012) ("defendant's intent to cause serious physical injury may be inferred from, inter alia, his conduct, the surrounding circumstances, and the medical evidence"); *People v. Terk*, 24 A.D.3d 1038, 1039 (3d Dep't 2005) ("defendant's intent to cause physical injury may be inferred from his actions, as well as from the severity of the victim's injuries" (citations omitted); *In re Gregory B.*, 242 A.D.2d 295, 296 (2d Dep't 1997) (intent to cause injury may be inferred from the totality of defendant's conduct, coupled with the quantity and severity of the injuries).

reasonably concluded that, in order to inflict such injuries, petitioner must have punched Martoni with substantial force. And, because "[a] jury is entitled to infer that a defendant intended the natural and probable consequences of his acts," *Bueno*, 18 N.Y.3d at 169-70, the jury could have concluded that petitioner intended to severely injure Martoni. Indeed, the "natural and probably consequence" of four forceful blows to the head could very well have been loss of consciousness or even brain damage. *See Caban*, 306 A.D.2d at 141 (intent to cause serious physical injury found where victim's nose was broken and he was briefly rendered unconscious).

Fourth, petitioner's intent may be inferred from his angry state of mind just prior to the altercation. Both Martoni and Weinbaum testified that petitioner immediately became "angry" and "hostile" upon hearing Martoni's simple request that he be announced. Petitioner "came back towards" Martoni, "raised his voice," and asked Martoni: "what is your fucking problem, Frank." (Martoni: 38, 49; Weinbaum: 134.) Petitioner confirmed that he was angry and "very displeased" with Martoni for stopping him at all. (Taebel: 169, 197.)

On direct appeal, petitioner complained that Martoni's testimony was not corroborated. (SR537, 549.) Yet, Martoni's injuries were, in fact, corroborated by his medical records, and petitioner's belligerent manner was confirmed by Weinbaum. In any event, there was no need to corroborate Martoni's testimony, because is well settled that "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'" *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)); *accord*

*Edwards v. Jones*, 720 F.2d 751, 755 (2d Cir. 1983); *People v. Calabria*, 3 N.Y.3d 80, 82 (2004); *People v. Arroyo*, 54 N.Y.2d 567, 578 (1982); *People v. Berger*, 52 N.Y.2d 214, 217 (1981).

## B.  The People Established That Petitioner's Violent Conduct Was Not Justified

On direct appeal, petitioner argued that his violent assault upon Martoni was justified because: "Martoni was much taller and heavier than" petitioner; Martoni "admitted that he was determined to keep [petitioner] from getting upstairs"; when Martoni "came at [petitioner] in the elevator, [petitioner] had no place to run and was justifiably afraid"; and Martoni threw "the first punch." (SR528, 537, 540, 542.) The Appellate Division rejected this argument, finding that the "evidence refuted defendant's justification defense." *Taebel*, 138 A.D.3d at 606. That decision did not unreasonably apply clearly established Supreme Court law.

Under Penal Law § 35.15(1), a person may "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person . . .." Penal Law § 35.15(1). (*See* T.255 (jury charge).) The statute "imposes a two-part test which involves both subjective and objective components." *Matter of Y.K.*, 87 N.Y.2d 430, 433 (1996). Under the subjective component, the fact-finder must determine if the defendant subjectively believed that physical force was necessary to defend against the imminent use of force. *Id.* Under the objective component, the fact-finder must

22

determine if defendant's belief was objectively "reasonable under the circumstances." *Id*. at 433-34 ("It is not enough that the defendant believed that the use of force was necessary under the circumstances; his reactions must be those of a reasonable person similarly confronted."). The reasonableness determination takes into account the defendant's "circumstances" and "situation," including the defendant's knowledge of the victim, the physical characteristics of both the defendant and victim, and any relevant prior experiences the defendant had. *People v. Goetz*, 68 N.Y.2d 96, 114-15 (1986). (*See* T.255-56 (jury charge).)

Because justification is a defense rather than an affirmative defense, the People bear the burden of disproving it beyond a reasonable doubt. *Y.K.*, 87 N.Y.2d at 433. Accordingly, where, as here, petitioner raises a legal sufficiency claim and asserts a justification defense, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational finder of fact could have found that petitioner's justification defense was disproved beyond a reasonable doubt." *Seals v. Heath*, 12-CV-1097, 2015 WL 1443002, at *6 (E.D.N.Y. Mar. 27, 2015).

Here, drawing every inference in the People's favor, the jury could have reasonably rejected petitioner's justification defense, for at least three reasons. First, the jury could have concluded that it would not have been reasonable for petitioner to believe that physical force was necessary to defend against the imminent use of force. *Y.K.*, 87 N.Y.2d at 433. Martoni testified that he had his arms out at his side as he sought to prevent petitioner from entering the elevator (Martoni: 39-40, 42, 50;

23

Weinbaum: 135-36); that Martoni put his foot in the elevator door to make sure it did not close (Martoni: 40); and that he did not touch or take a swing at petitioner (Martoni: 41-42). Martoni's unequivocal testimony, if credited by the jury, completely rebuts petitioner's claim that he was in danger of an imminent attack. *See People v. Terk*, 24 A.D.3d 1038, 1039 (3d Dep't 2005) ("although defendant claimed at the scene that the victim started the altercation by striking him in the back of the head as he used a urinal, a jury could nonetheless reasonably conclude, based on the evidence presented, that defendant need not have resorted to physical force to repel the attack"); *People v. Ziffer*, 43 Misc. 3d 140(A), 2014 WL 21788582, at *1 (2d Dep't May 9, 2014) ("A reasonable person would not have believed, under the circumstances of this case, that the use of physical force by the victim was imminent.").

Second, the jury could have reasonably concluded that petitioner employed excessive force to defend himself. "Generally, the force permitted [in defending oneself] is related to the degree of force reasonably believed necessary to repel various threats." *Y.K.*, 87 N.Y.2d at 433. That is, even if petitioner reasonably believed that he needed to use physical force to defend himself, the law permitted him to do so only "to the extent" that he "reasonably" believed it was "necessary" for that purpose. Penal Law § 35.15(1). Petitioner's use of physical force had to be proportionate to the threat that he faced. Here, even if petitioner felt threatened by Martoni's physical presence, the jury could have concluded that the sheer power and number of petitioner's punches was disproportionate to any threat petitioner could have reasonably perceived. *See Terk*, 24 A.D.3d at 1039 (holding that jury could reasonably

24

conclude that defendant "responded in disproportion to the threat he perceived"); *People v. Lane*, 241 A.D.2d 763, 765 (3d Dep't 1997) (although the "dazed and bleeding" victim "hit" or "took a 'whack'" at the defendant, this did not embody the "type of 'unlawful physical force' that would have justified defendant's response," namely, to pick up the victim and "pile drive[]" him head-first into cement); *Ziffer*, 2014 WL 2178858, at *1 ("even if it was reasonable to believe that the use of physical force by the victim was imminent, under the circumstances, a reasonable person would not have believed that, to repel the attack, it was necessary to hit the victim in the head with a large dustpan with such disproportionate physical force that the dustpan broke").

Third, even if the jury concluded that petitioner's response in punching Martoni twice in the head was reasonable and proportionate, the jury could have concluded that petitioner's continued pummeling of Martoni was unnecessary or disproportionate. That is, Martoni testified that after petitioner initially punched him twice in the head, Martoni was "stunned," "fuzzy" and "numb." (Martoni: 40-41.) He "staggered and . . . grabbed hold" of the entrance to the elevator because he "could feel [him]self falling" (Martoni: 39-40), and his hands "were probably hanging down because [he] was leaning against the wall . . ." (Martoni: 42). Nevertheless, even though petitioner was clearly in no danger at that point, he punched Martoni two more times in the same part of his head where he struck the initial blows. (Martoni: 39-40.) The jury could have reasonably concluded that this was unjustified. *See People v. Del-Debbio*, 244 A.D.2d 195, 195 (1st Dep't 1997) ("Even if a defendant is

25

justified in using deadly physical force at the beginning of a single, ongoing encounter with an assailant, his right to use that force terminates at the point he can no longer reasonably believe the assailant still poses a threat to him."); *accord People v. Delin*, 145 A.D.3d 566, 566 (1st Dep't 2016). As the trial court observed at sentencing, the "second series of punches . . . were totally unnecessary," because "[i]t's clear at that point that Mr. Martoni wasn't going to pose any resistance to Mr. Taebel going upstairs." (5/10/13 Minutes at 17-18; *accord* SR581-82, 586-87 (quoting 5/1/13 Minutes at 4).)[9]

## C. The Appellate Division Properly Rejected Petitioner's Claim That Martoni's Testimony Was Inconsistent and Incredible

The petition asserts a single claim -- that the verdict was supported by legally insufficient evidence because Martoni's testimony: (1) was contradicted by the testimony of both petitioner and Weinbaum; (2) was inherently inconsistent; and (3) did "not make sense and should be legally incre[]dible." (Pet. ¶ 12.) Petitioner made the same argument in his pro se brief on direct appeal. There, relying on a line of New York cases derived from *People v. Ledwon*, 153 N.Y. 10, 46 N.E. 1046 (1897), petitioner claimed that Martoni's testimony should be rejected as "'incredible or unreliable as a matter of law.'" (SR548-49, 558.) The Appellate Division rejected this argument, holding, among other things, that there was "no basis for disturbing the jury's determinations concerning credibility." *Taebel*, 138 A.D.3d at 606. That

---

[9] The evidence, described above, that petitioner was belligerent and agitated prior to the attack would also tend to support a finding that petitioner was the initial aggressor.

decision did not unreasonably apply clearly established Supreme Court law.

As a threshold matter, the holding in *Ledwon* and its progeny, upon which petitioner relied, is limited to cases in which the People's only witness gave irreconcilable trial testimony pointing to both guilt and innocence. *See People v. Delamota*, 18 N.Y.3d 107, 113-16 (2011); *People v. Calabria*, 3 N.Y.3d 80, 83 (2004). That is not the situation here, because even though Martoni was the only prosecution witness to describe the actual altercation, his testimony was unwavering and was not inherently inconsistent. *See Delamota*, 18 N.Y.3d at 113-16 (distinguishing *Ledwon*; "unwavering" trial testimony of one eyewitness was sufficient for conviction despite conflict between eyewitness' testimony and that of other witnesses, and inconsistencies between witness' trial testimony and his disputed pretrial statements); *Calabria*, 3 N.Y.3d at 83 (distinguishing *Ledwon* because in the instant case, "by contrast, the victim never wavered in her testimony").

More importantly, the *Ledwon* line of state law decisions does not govern on federal habeas review. In *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060 (2012), the Supreme Court held that it is error "to look to [state] law in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id.*, 132 S. Ct. at 2064. Although habeas courts must "look to state law for the substantive elements of the criminal offense ... the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Id.* (internal quotation marks and citation omitted).

Under federal law, petitioner's argument – that Martoni's testimony should be rejected as inconsistent and incredible – simply has no purchase. The Supreme Court has repeatedly held that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos*, 565 U.S. at 7 (quoting *Jackson*, 443 U.S. at 326). Juries must be accorded "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Johnson*, 132 S. Ct. at 2064 (quoting *Jackson*, 443 U.S. at 319). Were a court to order the vacatur of a guilty verdict based on "inconsistencies" in the evidence, that decision would evince a "fail[ure]" to "review the evidence in the light most favorable to the prosecution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010); *accord Santone v. Fischer*, 689 F.3d 138, 151 (2d Cir. 2012).

In fact, the jury's discretion is so broad that "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Johnson*, 132 S. Ct. at 2065. And the only question under AEDPA is whether the state court's denial of the *Jackson* claim was unreasonable. Here, the jury obviously credited Martoni's testimony and believed his description of the altercation. The jury's decision should not be second-guessed, given the doubly deferential standard of review under *Jackson* and AEDPA. *See Johnson*, 132 S. Ct. at 2064.

In any event, the inconsistencies and contradictions that petitioner highlighted on direct appeal are either: not clearly inconsistent or contradictory; irrelevant to the issues at hand, and relevant only to witness-impeachment; or trivial or minor inconsistencies that one would expect from witnesses who were recounting events that happened sixteen months prior to trial.

First, petitioner argued that Martoni testified inconsistently at trial regarding when he first saw petitioner, and that he also contradicted his grand jury testimony in which he claimed he first saw petitioner in August 2011. (SR548-51, 555-57.) But, Martoni ultimately conceded at trial that he could not recall when he first saw petitioner, and in any event, Martoni's inability to remember exactly when he met petitioner was clearly not relevant to the ultimate issue of guilt.

Second, petitioner claimed that Martoni falsely testified that he "never attempt[ed] to physically block" petitioner (SR551-52) and that Martoni "never raised his arms" during the encounter (SR544). In fact, there is no such testimony. Although Martoni testified that he had his arms at his "side," he did not testify that he never raised them. (Martoni: 42.)

Third, petitioner argued that although Weinbaum testified that she did not see the altercation because she turned around to take care of entering visitors, the video showed there were no such visitors. (SR541, 544.) Yet, Weinbaum expressly testified that she turned around to face the front door because it "looked like people were coming in" – not that they did come into the building. (Weinbaum: 136.)

Finally, petitioner observed that Weinbaum testified that when she turned around at the front desk, she did not see either Martoni or petitioner outside the elevators, thus implying that Martoni and petitioner were both in the elevator. Petitioner claimed that Weinbaum's testimony contradicted Martoni's testimony that he did not fully enter the elevator. (SR551-55.) But, as noted above, Weinbaum's testimony on this point was unclear. (*See* page 6 & n.4, *supra*.) And even if we assumed, *arguendo*, that Weinbaum did testify that she turned around and did not see Martoni or petitioner outside the elevators, and we further assumed that Weinbaum's testimony was correct and Martoni's testimony was incorrect, this would still not go to the heart of Martoni's testimony that petitioner repeatedly struck him without provocation.

Contrary to petitioner's assertions of "inherent" and widespread inconsistencies, Weinbaum and Martoni gave credible, mutually corroborative testimony that petitioner was the aggressor, and that he swore at them and was hostile and agitated even before Martoni attempted to block him from entering the elevator. It also bears noting that the jury had every reason to doubt petitioner's account, as the court charged that petitioner was the only "interested" witness as a matter of law. (T.248.) *See People v. Agosto*, 73 N.Y.2d 963, 967 (1989); *Rivers v. Smith*, 13CV00549, 2015 WL 8489963, at *14 (E.D.N.Y. Dec. 8, 2015).

In short, habeas courts are prohibited from reviewing issues going to credibility, and the testimonial inconsistencies that petitioner highlights here are

either non-existent or trivial.  Accordingly, in light of the double deference that must

be accorded the Appellate Division's decision, petitioner's claim should be denied.

## **CONCLUSION**

For the reasons set forth above, the petition for a writ of habeas corpus should

be denied, and no certificate of appealability should be issued.

Respectfully submitted,

Eric T. Schneiderman
Attorney General of the
State of New York
120 Broadway
New York, New York 10271


By:     /s/ Paul B. Lyons
Paul B. Lyons (PL5036)
Assistant Attorney General
(212) 416-8229
Paul.Lyons@ag.ny.gov


PRISCILLA I. STEWARD
PAUL B. LYONS
Assistant Attorneys General
Of Counsel

February 14, 2017

## DECLARATION OF SERVICE

PAUL B. LYONS declares under penalty of perjury that on February 14, 2017,

he served the annexed memorandum, along with unpublished decisions cited therein,

by having them mailed via the United States Postal Service to the following address:

>Mitchell Taebel
>IND. 2536-2012
>2020 Golden Gate Dr.
>Long Beach, IN 46360

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2017.

>  /s/ Paul B. Lyons
>Paul B. Lyons (PL5036)
>Assistant Attorney General
>120 Broadway
>New York, New York 10271
>(212) 416-8229
>Paul.Lyons@ag.ny.gov