UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MITCHELL TAEBEL,

        Petitioner,

        -v-

JUSTICE MICHAEL SONBERG,

        Respondent.
-----------------------------------------------------------X

OBJECTIONS TO REPORT
AND RECOMMENDATION

16-CV-6337

**TO WILLIAM H. PAULEY, III, UNITED STATES DISTRICT JUDGE :**

**THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT EVERY ELEMENT OF
A CHARGED OFFENSE. IN RE WINSHIP, 397 U. S. 358.**

*This case is based entirely on a false testimony of someone claiming he had the legal right to stop me from entering the building yet the trespass charge was dismissed at trial.*

Discussion II: B. Analysis Section 3: "Taebel argues that the verdict was based upon legally insufficient evidence because 1) Martoni's testimony is contradicted by Weinbaum and Taebel's testimony, 2) there are "inherent contradictions" within Martoni's testimony, and 3) Martoni's testimony "does not make sense" and should be treated as "legally incredible.". Although the Petition is devoid of detail or any explanation of the facts underlying these arguments".

In explanation of these arguments:

I.     Legally Insufficient Evidence

    A.     Guilty Verdicts Rest On False Testimony

The guilty verdicts are founded solely on a fabricated testimony from a proven to be, incredible Complaining Witness. The Complaining Witness's testimony should be considered incredible as a matter of law. There is zero credible evidence that the Defendant acted unlawfully. The Defendant's testimony, which is supported by the weight of the evidence, indicates he was justified in his use of force as described under Penal Law 35.15. There are inherent contradictions in the statements made by the Complaining Witness and the testimony is uncorroborated by physical evidence and the testimonies of Ms. Weinbum and the Defendant.

        1.     Inherent Contradictions

The Complaining Witness, under direct examination discussing the first time he had seen the defendant:

Q. When was the first time you saw him at all, not talked to him, but saw him as you described?
A. In April -- I am sorry, in August, sometime in August (37:10-12)

The Complaining Witness's response "In April – I am sorry, in August" Meets the requirements of the Ledwon rule, which states, an inherently contradicting testimony that points to both guilt and innocence, alone, cannot provide grounds to establish guilt beyond a reasonable doubt (see People v Ledwon, 153 NY 10, 17, 18 [1897]). Furthermore, under cross-examination, the witness made more substantial contradictions regarding the first time he had seen the defendant. As he sensed the defense about to make an argument against him, he suddenly began to change his story, contradicting his statement above:

DEFENDANT: So, once again, you claim the first time you saw me was when?
WITNESS: Sometime in August.
DEFENDANT: Sometime in August. Wow.
WITNESS: Wait, let me clarify that, not the first time I had seen you. The first time I had seen you I can't remember. The only time I had seen you—
DEFENDANT: oh?
THE COURT: Mr. Taebel, quit the comments, okay. The jury is directed to disregard them. Let the witness answer the question. You asked him when the first time was he saw you. Keep quiet till the question is answered.
THE WITNESS: I had seen the gentleman leaving with Raquel Toro on other occasions.
THE COURT: Before the beginning of August?
THE WITNESS: Yes, Your Honor. (69:9-25)

THE COURT: Well no. Lets first clarify what we are talking about. When is the first time you think you saw Mr. Taebel?
THE WITNESS: The first time? I honestly don't remember, your honor. I couldn't say.
THE COURT: And you have no clue as to whether it was, it was some point before August?
THE WITNESS: Yes.
THE COURT: And you don't remember if it was April, May, June, July?
THE WITNESS: Honestly, Your Honor, I do not.
THE COURT: Do you know if it was sometime in 2011 or before that?
THE WITNESS: I would say it was in 2011 probably. (73:12 to 74:1)

Under cross-examination, the witness for the first time claimed he couldn't recall, when he had first seen the Defendant and whether for certain it was even in the year of 2011. Prior to this sudden change in his testimony, the Complainant had already clearly stated three times, under oath, that the first time he had ever seen the Defendant was only a few weeks prior to the incident ("sometime in August"), the incident happened on September 2nd. The first time was to the grand Jury (8:8), second, under direct examination (37:12) and the third, under cross-examination (69:11). To the Grand Jury:

Q. How do you know that person?
A. He came to be known as the boyfriend of our tenant Raquel Toro.
Q. Approximately, when did you first meet this person?
A. Sometime in August.
Q. Of?
A. 2011.
Q. How did you meet him?
A. I had seen him with the tenant when they would leave in the mornings. (8:3-13)¬

When the doorman, saw the Defendant in the building for the first time, is clearly relevant because it would imply, either guilt or innocence of the trespass charge (which was dismissed); and it would reveal, whether the doorman could have believed, there was any reason or authority to prevent the Defendant from entering the building. Under the Ledwon Rule, this testimony cannot establish grounds for proof beyond a reasonable doubt.

It may be worth noting that the Defendant had been visiting the building for six months and living there as a full time resident for four months and had seen this daytime doorman nearly every day. The doorman knew very well that the Defendant had been living in the building. In fact the Defendant had walked the dog out the back door that morning without being stopped (like every other morning) and had even walked out the front door past the doorman only 15 minutes prior to returning which is when the incident occurred. The doorman was only stopping the Defendant to harass him because the doorman didn't particularly like the Defendant. Also, it is relevant to note the Defendant's girlfriend is Puerto Rican and may have factored in to why this particular doorman felt he had just cause to harass her guest and boyfriend, as The Barclay prided itself as a very exclusive and upscale residence. It is also worth noting that the Defendant had never been stopped by any of the other doormen in the four months he had resided at The Barclay prior to the incident.

2. Conflicts Between Witnesses

The only other witnesses of the incident were Ms. Weinbum (the building manager) and the Defendant. Her testimony is unmistakably supportive of the testimony given by the Defendant. In the Complaining Witness's testimony, he describes being punched four times in the corridor, never entering the elevator, never attempting to physically block the Defendant; and being punched from the elevator doorway across the hall. All of which are false claims and contradicted by the testimonies of both the Defendant and Ms. Weinbum.

Ms. Weinbum under direct examination,

Q. So just what you actually saw.
A. Yeah, Mr. Martoni ran after the Defendant.
Q. And what happened at that point?
A. The Defendant kept going towards the elevator and Frank basically put his arms at his sides preventing.
    THE COURT: I'm sorry, whose arms at whose side?

THE WITNESS: Frank Martoni put his arms out.
THE COURT: His own arms?
THE WITNESS: Yes, like this, against the elevator so the defendant would not go in the elevator.
Q. Where was the defendant when Frank was positioned? And just for the record you are extending your arms slightly lower than your shoulders, out to the side?
A. Correct. The defendant was facing him at that time.
Q. And where were you when this –
A. I was at the door. I was -- there was nobody at the door and people were kind of coming in. looked like they were coming in, so I stayed there and then I turned around and I no longer saw Mr. Martoni and the defendant.
Q. So when you say you turned around, which way were you facing?
A. I was facing the door. (135:22 to136: 18)

Q. And when you turned around, what did you see?
A. Well I didn't see either person. I kind of made the assumption that they were
    THE COURT: Lets not talk about the assumptions that you made.
    THE WITNESS: Okay.
Q. You didn't see –
A. I didn't see anyone, no.
Q. Did you come to see either of those people again?
A. I did. I saw frank COME OUT OF THE ELEVATOR holding his left eye. (137:3-13)

Q. From that perspective you had, could you actually see the elevator door open?
A. Yes I did. I was a little bit this way.
Q. Could you see inside the elevator?
A. No. (138:16-20)

The Defendant's description of the incident is consistent with the testimony given by Ms. Weinbum. They clearly correspond on four things that contradict the testimony given by the complaining witness: (1) They do not indicate the complaining witness was punched four times in the corridor. (2) They do not indicate he and the Defendant remained outside of the elevator throughout the altercation (she didn't see either of them because they went into the elevator). (3) They both say the complaining witness raised his arms attempting to physically stop the Defendant from entering the elevator. (4) They both say the Complainant walked out of the elevator.

Defendant's testimony:

    The elevator doors open and this guy, like, jumps in front of me, he is trying to block me, my access to the elevator, you know, and I pushed right through into the elevator. And once inside the elevator he continued, that is when he, like, lost it, like he was, like, you know, he just lost it and he started attacking me and it turned into, like, a frantic grabbing match. And I got hit in the face in the middle of it and, you know, I got him off me once, but he just came back at me like faster and harder and he just wouldn't stop. And being in the elevator I really couldn't back up, I couldn't retreat, that wasn't even an option at that point. So, as I said, I did get hit, I had,

like, a bloody lip.... So anyways, I struck him and that is what I had to do to get him off me and so that was, that is what happened. And after – and I immediately stopped, I only struck him once (169:19 to 170:18).

Again, the Complaining Witness's testimony contradicts four clear uniformities between the Defendant and Ms. Weinbum: (1) They do not indicate the Complaining Witness was punched four times in the corridor. (2) They do not indicate the Complainant and the Defendant remained outside of the elevator. (3) They both say the Complaining Witness raised his arms in an attempt to physically stop the Defendant. (4) They both say the Complainant walked out of the elevator.

Complaining Witness's version of the incident,

    Direct Examination:

A. I am backing up. The two elevators on the left we call elevator one, elevator two, the one on the right is elevator three. Elevator three opens up. I turn to go towards elevator three. As I am Walking I hear what's your fucking problem, Frank, and I received two shots to my left temple.
Q. And just for the record, you are indicating on the left side of your face just next to your eye?
A. Yes, sir, I am.
Q. Please continue.
A. I was staggered and I grabbed hold, if this is the entrance to the elevator I grabbed hold of it and pulled myself out. As I am coming out I once again hear what is your fucking problem, Frank. I received two more shots to the same spot, which puts me on the other side of the hall or corridor, if you prefer. (39:7-22)

    Under Cross-Examination:

THE DEFENDANT: Okay Mr. Martoni, you said you were struck four times in the exact same spot, is that correct?
THE WITNESS: On the left side of my temple.
THE DEFENDANT: You sure it wasn't just once?
THE WITNESS: I heard four cracks.
THE DEFENDANT: You heard four cracks. Okay. Also you said that you were not in the elevator all the way, is that correct?
THE WITNESS: I wasn't in the elevator all the way, no. I was knocked partially into the elevator. I grabbed ahold before I was falling in.
THE DEFENDANT: Even though Ms. Weinbum's statement says –
Mr. ROONEY: Objection, Objection. (62:20 to 63:7)

These statements from the Complaining Witness reveal a number of issues in his testimony:
1.     They clearly contradict the consistencies between the other two testimonies. The Complaining Witness does not describe himself pursuing the Defendant, he describes himself backing up. He then describes himself turning towards the elevator and hearing the Defendant before being struck twice as he is walking. However, both the Defendant and Ms. Weinbum clearly stated they saw him with his arms raised, attempting to block the Defendant's path to the elevator. He denies this entirely. He describes a situation where he never used physical force

against the defendant, he claims to have been sucker punched without even being able to see the defendant; "I never saw where he was, I just heard him in my left ear" (40:18-19). He claims not being able to see the Defendant because it makes his fabricated story easier to tell. He clearly denies that he and the Defendant were ever entirely inside the elevator during the altercation. He denies being in there, because that is where he lost his temper and proceeded to attack the Defendant, slamming him against the wall and hitting him in the face. The other two witnesses contradict these claims and under examination they are undoubtedly, incoherent and intended deceive. Also, he claims the second two punches send him from the elevator doorway, across the hall, but Ms. Weinbum and the Defendant clearly state, he walked out of the elevator. Additionally this occurred after claiming to have pulled himself out of the elevator doorway, which is after Ms. Weinbum had turned around and then turned back around. She was watching at that time and would have seen some of the incident if it occurred as he claimed.

2. The Complaining Witness confirms under cross-examination that he is claiming to have been struck four times in the exact same spot. When asked by the Defendant, "are you sure it wasn't just once?" (62:23). Instead of simple saying yes or no, he averted, and said, "I heard four cracks" (62:24). Four punches to the same spot would be very difficult for even a boxer, especially when someone is standing and moving around as he described. It would be unusual for anyone to throw four punches to the same spot.

3. In the Complaining Witness's testimony, he claims the "second two punches", put him on the other side of the hall (39:20-21). How would two punches send him into the elevator doorway and then another two punches send him across the hall in the opposite direct of the first two punches? Wouldn't an additional two punches to the exact same spot send him further into the elevator? The second two punches would have had to come from 180 degrees in the opposite direction of the first two, and the Complaining Witness would have had to make a 180 degree turn as well in order to be punched in the exact same spot. This also contradicts Ms Weinbum's testimony where she states she saw the Complainant come out of the elevator holding his eye ( 137:13).

4. Despite the description given by the prosecution of the video footage, and the narration during playback before the jury, the video better serves the defense. The Complaining Witness described picking up a radio before the incident, but it appears more as if he was setting it down. If he had set the radio down at that point, it could indicate his intent to use force and the need to have two free hands. After the altercation, the video shows him returning to the post carrying his hat in his right hand and there does not appear to be a radio in his left hand (he also proceeded to opening the door for someone). This would also explain why the Defendant didn't recall seeing a radio. Mr. ROONEY: He had a radio in his hands right? DEFENDANT: No. (189:3-4). The body language of the Complaining Witness also suggests intent to use force and he clearly steps in behind the Defendant while speaking to Ms. Weinbum. He also makes an uncommitted attempt to block the Defendant while still on camera but the Defendant was able to walk past. The Complaining Witness then pursues.

5. In no way can he justify an attempt to bar the Defendant from the building when the Defendant had been living there since early May and visiting the building on a regular basis since March (almost six months prior to the incident).

6. He is fabricating because he, now knows, that any use of physical force was illegal and against the building policies he's claiming to have been enforcing; and when asked what his management company instructs him to do in the event he would need to enforce those policies, he said, "I would call my superintendent first. We are not allowed to physically touch

anybody."(85:2-3). This incident never should have happened, and it only happened because the doorman was abusing the minor authorities of his position and he broke the rules.

7. Furthermore the Complainant refuses to admit the absurdity of even questioning someone for a permission slip and imposing himself when they've been living in the building. When asked by the Defendant if he could understand how someone might find this harassment "rude", he asked the defendant to repeat the question. Then as he attempted to divert, the Court insisted he answer the question:

THE COURT: NO, sir, answer his question. If someone lived in the building and you challenged them, do you understand why they might consider that rude?
THE WITNESS: No, sir (68:8-11).

8. The issue of the permission slip is obsolete. The Defendant's girlfriend (Ms. Toro) had filled out a number of permission slips including a long-term slip and she notified the building manager (Ms. Weinbum), that the defendant was her boyfriend and would be living with her indefinitely. The doorman claims he was stopping the defendant because the permission slip was expired and he had previously removed it but the Defendant had been living there since May and already had rights as an occupant of the building. According to NY-Section 235-F: Unlawful restrictions on occupancy, A.K.A. "The Roommate Law", the landlord cannot tell a single tenant that he/she cannot have a roommate and he/she can have a roommate without first gaining permission from building management.

In such an instance where the witness is deemed to be "incredible or unreliable as a matter of law" (People v Calabria, 3 NY3d at 82), the conviction must be vacated because "the jury is left without any basis, other than impermissible speculation, for its determination of" guilt (People v Jackson, 65 NY2d at 272); see also People v Fratello, 92 NY2d 565, 573 [1998])

## CONCLUSION
For the forgoing reasons there is no probable cause or proof beyond a reasonable doubt.

Dated: December 6, 2017

Mitchell Taebel
MitchTaebel.us

STATE OF INDIANA )
COUNTY OF LAPORTE )

Subscribed and sworn to before me this 6th day of December, 2017.

Maria T. Kucharski

MARIA T. KUCHARSKI
Notary Public - Seal
State of Indiana
La Porte County
My Commission Expires Nov 13, 2022

**NOTARY**

Mitch Taebel
2020 Golden Gate Dr.
Long Beach, IN 46360

December 6, 2017

William H. Pauley
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

RE: 16-CV-6337

To: William H. Pauley/Clerk of Court

    The above case number is in consideration of this court. Evidence from the case including video can be found at MitchTaebel.us under Case Documents. The state's ruling is clearly against the weight of the evidence and the entire incident revolves around his testimony that he thought he had the right to stop me however the trespass charge was dismissed in trial. This is a revised copy of the document. Please publish this copy and send to William H. Pauley.


Regards,

*[signature]*

Mitch Taebel
www.MitchTaebel.us

Mitch Taebel
2020 Golden Gate Dr.
Long Beach, IN 46360

December 10, 2017

United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

RE: 16-CV-6337 (WHP) & (JLC)

To: United States District Court William H. Pauley,

    Please attach the flowing Exhibit A and documents to the Objections of the Report and Recommendations and publish. It is imperative that these documents go before the Judges and James L. Scott is given the opportunity to revise his report and recommendation.


Regards,

Mitchell Taebel
www.MitchTaebel.us

# Exhibit A

1. Police Report- Describing the Doorman being punched one time.

2. Deponent's Report- Dated 9/16/11 (two weeks after the incident) Describes the Witness being punched one time.

3. Medical Report dated 9/2/2011 the day of the Incident, Describing the doorman being punched one time.

4. Email to Attorney discussing Counter charges of Harassment and Assault against the doorman

5. Notice of Indictment Dated June 11, 2012. Over 9 months since the Desk Appearance Ticket/Incident and well over the 6 month Limitation, Attempting to coerce a plea Agreement.

## All of which support the testimony of the Defendant and discredit the story of the Complaining Witness.

"If a person is attacked, and that person reasonably believes that he is in immediate danger of death or grievous bodily injury, he has no duty to retreat and may stand his ground and, if he kills his attacker, he has not exceeded the bounds of lawful self-defense." Brown v. United States, 256 U.S. 335 (1921)

16-CV-6337

 **END OF ARREST REPORT
M11677089** 

[Print this Report]  [Add an another Arrest]

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 1 of 1

| THE PEOPLE OF THE STATE OF NEW YORK | MISDEMEANOR |
| -against- | |
| 1. Mitchell Taebel (M 25)   ECAB # 1261635 | |
| Defendant. | |

Police Officer Michael Farinaccio, shield 16315 of the 019 Precinct, states as follows:

On September 2, 2011, at about 12:30 hours inside of 1755 York Avenue in the County and State of New York, the Defendant committed the offenses of:

1. PL120.00(1)   Assault in the 3rd Degree-DNA-Eligible MISD
   (1 count)
2. PL240.26(1)   Harassment in the Second degree
   (1 count)

the defendant, with intent to cause physical injury to another person, caused such injury to another person; and the defendant, with intent to harass, annoy and alarm another, subjected that person to physical contact and attempted and threatened to do the same.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Frank Martoni, of an address known to the District Attorney's Office, that informant observed defendant strike informant about informant's face with defendant's closed fist, thereby causing a laceration, swelling, bruising, and substantial pain to informant's left eye.

False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.

_____       9/16/930
Deponent                      Date and Time

ACT 5 Version 4.3.5 Created on 09/16/11 9:28 AM

# Lenox Hill Hospital - New York, NY 10075-1850

| | | | |
|---|---|---|---|
| Patient: | MARTONI, FRANK | DOB: | 9/14/1962 |
| MR #: | 5607216 | Age/Gender: | 48y M |
| DOS: | 9/2/2011 13:29 | Acct #: | 102010848 |
| Private Phys: | PATRICK MIZRAHI, MD/DO | ED Phys: | Richard Leno, MD |

## HISTORY OF PRESENT ILLNESS

**Note**
Chief complaint: assault
HPI: Pt. is a 48 y.o. male c/o being assaulted at work prior to arrival. Pt. was hit in the left face with a fist. There was no LOC. Now pt. has HA, swelling around the left eye and bleeding in the left eye. Pt. denies any dizziness, N/V, visual or hearing changes, sensory or motor deficit, neck pain or stiffness, change in MS. Pt. is not on blood thinners.
<N2V 09/03/11 23:09>
   The patient was not offered HIV testing because of a medical condition that includes but is not limited to an emergent condition or altered mental status. <N2V 09/03/11 23:09>
Medical screening complete. <N2V 09/03/11 23:09>
I have acknowledged the transfer of care for this patient. <N2V 09/03/11 23:09>

## PAST HISTORY

**Past Medical/Surgical History**
   Home medications: Patient not currently taking any medications. < ECH 9/2/2011 13:32>
   The patient's pertinent past medical history is as follows: Hypothyroidism < ECH 9/2/2011 13:32>
The patient's pertinent past surgical history is as follows: No significant problems < RHC 9/2/2011 15:54>
At the time of this signature, I have reviewed and confirm the documented Past History. <N2V 09/03/11 22:52>

**Social History**
No significant social history. <N2V 09/03/11 22:52>

## REVIEW OF SYSTEMS

**Musculoskeletal**
Please see HPI

CONSTITUTIONAL: No fever, chills
EYES: No visual changes, eye pain or discharge
ENT: No ear pain; hearing changes, ear discharge, no nasal discharge
GI: No nausea, vomiting,
MS: No myalgia, muscle weakness, joint pain, neck pain
SKIN: laceration left eyebrow
NEURO: + headache, no confusion, no head trauma, no motor weakness, no paresthesias, no speech difficulty

All other systems are negative except as noted above or in HPI
<N2V 09/03/11 23:11>

## EXAM
VITAL SIGNS: I have reviewed nursing notes and confirm.

## OUR DEFENSE

**Mitch Taebel** Hello Amelia, I hope you had a good weekend. I would like to further discuss ...

**Mc Govern, Amelia** <AMcgovern@legal-aid.org>
to me

Mr. Traebel,

Yes, I will subpoena videotape, but DA may have possession already.

Neither the police nor the da will allow a "countercharge"--the only time the police will accept a complaint from a defendant on an open case is when there is some new conduct by the compl and make a statement which could be used against you in this case.

What has been going on? Has he said anything to you? Please keep me informed as to anything that he says to you. Keep track of dates and times.

Yes, doorman should not have used physical force and will look into this type of self defense type defense.

As for the police, if they have a report of a ████████████████████████████████████████. Also, if you opened the door, they may have taken that as con

If you are hiring an attorney, please let me know as soon as possible. Further, I am only dealing with your criminal case. Any civil issues should be handled by a civil attorney.

Yours truly,
Amelia McGovern
(I'm sitting in court + wanted to get an answer to you asap--we can talk further at a later time--)

Sent from my Verizon Wireless BlackBerry

---

**From:** Mitch Taebel <mitchtaebel@gmail.com>
**Date:** Mon, 17 Oct 2011 17:42:23 -0400
**To:** Mc Govern, Amelia<AMcgovern@legal-aid.org>
**Subject:** OUR DEFENSE

-----------------------------------------------------------------------------

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) and may contain legally privileged and/or confidential informatic or copy this communication. Please notify the sender that you ████████████████████████████████████████.

# DONALD FRAZIER
*Attorney at Law*
233 Broadway; Suite 2201
New York NY 10279
(212) 385-3959; Fax: (858) 300-5411
don@donfrazierlaw.com
June 11, 2012

Mr. Mitchell Taebel
2020 Golden Gate Drive
Long Beach IN 46360

Dear Mr. Taebel:

Your next appearance is set for July 25, 2012 at 100 Centre Street. Unfortunately the posture of the case has changed—to your detriment.

It is generally wise to dispose of a criminal matter without trial if such opportunity is allowed. Such opportunity is less available now.

The prosecutor has filed an indictment, raising the charge to a Class E felony (PL110.05(6)), with a potential sentence of years in prison. However since my work focuses on misdemeanors, at the next appearance I will seek to be relieved so that felony counsel can be appointed for you.

I advise that you authorize me to attempt to negotiate a plea offer of a misdemeanor without jail time. Since your case has progressively become more difficult to resolve, I make no promises but believe it would wise to try to cut your potential losses as quickly as possible immediately.

Sincerely,

Donald Frazier







USPS Priority Mail Express envelope, received stamp "RECEIVED DEC 12 2017 CLERK'S OFFICE S.D.N.Y."

Mitch Taebel
2020 Golden Gate Dr.
Long Beach, IN 46360

CERTIFIED MAIL®

7014 2120 0001 8905 6958

RECEIVED
DEC 12 2017
CLERK'S OFFICE
S.D.N.Y.

USMS
SDNY

Civil Dct
MG

United States
Southern District
500 Pearl St
New York, NY

RECEIVED
DEC 12 2017
CLERK'S OFFICE
S.D.N.Y.